**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _5/15/2019_

Jean D. Ramsook,

                                        **Plaintiff,**

            -against-

Nancy A. Berryhill, Acting Commissioner of
Social Security,

                                        **Defendant.**

**1:18-cv-01176 (SDA)**

**<u>OPINION AND ORDER</u>**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Jean Ramsook ("Ramsook" or "Plaintiff") brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner"), denying her application for Disability Insurance Benefits ("DIB").[1] (Compl., ECF No. 1.) Presently before the Court is Plaintiff's motion, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings (Notice of Mot., ECF No. 26 & Mem. L., ECF No. 27), the Commissioner's cross-motion (Notice of Mot., ECF No. 28 & Mem. L., ECF No. 29) and Plaintiff's reply. (Reply Mem., ECF No. 30).

For the reasons set forth below, Plaintiff's motion is DENIED and the Commissioner's cross-motion is GRANTED.

---

[1] On January 18, 2017, the Social Security Administration ("SSA") promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 60 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Ramsook's claims were filed before that date, to the extent that the Social Security regulations are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017.

**BACKGROUND**

I.      **Procedural Background**

Ramsook filed an application for benefits on April 18, 2014, alleging a disability onset date of February 4, 2013 due to a back injury, lumbago,[2] radiculitis unspecified,[3] lumbosacral[4] spondylosis[5] without myelopathy,[6] and muscle spasm. (Administrative R. ("R."), ECF No. 23, at 84-85.) Ramsook later amended her disability onset date to February 13, 2013. (R. 81-82.) Ramsook's application was denied on June 13, 2014 and she requested a hearing, which was held on May 3, 2016 before Administrative Law Judge ("ALJ") Elias Feuer (R. 29-83, 93, 97-108.) At the hearing, Ramsook was represented by counsel. (R. 31.) ALJ Feuer denied Ramsook's benefits application on September 22, 2016. (R. 12-24.) ALJ Feuer's decision became the Commissioner's final decision when the Appeals Council denied Ramsook's request for review on December 11, 2017. (R. 1-4.)  This action followed.

---

[2] Lumbago is a non-medical term for any pain in the lower back. *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 1076 (32d ed. 2012).

[3] Radiculitis is inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal. *Dorland's* at 1571.

[4] Lumbosacral refers to the lumbar and sacral regions of the spine. *Dorland's* at 1076. "A normal human vertebral column consists of thirty-three vertebrae labeled according to their position and region (in descending order, cervical ('C1' through 'C7'), thoracic ('T1' through 'T12'), lumbar ('L1' through 'L5'), sacral ('S1' through 'S5') and coccygeal ('Co1' through 'Co4')). The fifth lumbar vertebra, for example, is labeled 'L5.' The space between the fifth lumbar and first sacral vertebrae, for example, is labeled 'L5-S1.'" *Friedman v. Astrue*, No. 07-CV-03651 (NRB), 2008 WL 3861211, at * 2 n.4 (S.D.N.Y. Aug. 19, 2008) (citing *Dorland's Illustrated Medical Dictionary* 2079 (31st ed.2007)).

[5] "Spondylosis is a broad term that simply refers to some type of degeneration in the spine. Most often, the term spondylosis is used to describe osteoarthritis of the spine, but it is also commonly used to describe any manner of spinal degeneration." *Van Allen v. Colvin*, No. 15-CV-00174 (DJS), 2016 WL 5660377, at *2 (D. Conn. Sept. 29, 2016) (citation omitted).

[6] Myelopathy refers to "any of various functional disturbances or pathological changes in the spinal cord, often referring to nonspecific lesions[.]" *Dorland's* at 1220.

## II.  Non-Medical Evidence

Born on March 19, 1964, Ramsook was 48-years-old at the alleged onset date and 52-years-old at the time of the ALJ hearing. (R. 84, 268.) Ramsook attended school in Trinidad through the ninth grade and later took some nutrition classes at Lehman College. (R. 32.) From 1994 until mid-February 2013, Ramsook worked as a department manager for various supermarkets. (R. 64-65, 210.)

## III.  Relevant Medical Evidence Before The ALJ

### A.  Weill Cornell Medical Center

On January 8, 2013, Plaintiff saw nurse practitioner ("NP") Milena Nikolova at Weill Cornell Medical Center after falling off a ladder at work the previous day. (R. 280-82.) Ramsook reported that she hit her head, back and buttocks and developed a "slight headache" but did not lose consciousness. (R. 281.) Ramsook complained of pain that had increased since the fall. (*Id.*)

On examination, NP Nikolova  noted that Ramsook appeared in pain, but showed no acute distress. (*Id.*) NP Nikolova diagnosed a headache and body contusion and recommended nonsteroidal anti-inflammatory drugs ("NSAIDs"), rest, and abstinence from heavy lifting, climbing, sudden body movements, and bending. (R. 280, 282.) NP Nikolova further recommended that Ramsook follow up with her primary care provider, but advised her that she could return to work on January 14, 2013. (*Id.*)

### B.  Midtown NY Doctors Urgent Care

On January 25, 2013, Ramsook saw Dr. Oleg Olshanetskiy, D.O., at  Midtown NY Doctors Urgent Care, complaining of lower back pain and right hip pain. (R. 292.) Upon examination, Ramsook had a full range of motion of the lumbar spine with some hesitance upon side bending

on the right and some tenderness at L4-5 extending down her right side. (R. 293.) Dr. Olshanetskiy diagnosed lumbar spine strain/sprain, right hip contusion and right sacroilitis.[7] (R. 291, 293.) He advised Ramsook to discontinue ibuprofen and prescribed Nabumetone.[8] (*Id.*) Dr. Olshanetskiy also referred Ramsook for x-rays of her pelvis, left hip and lumbar spine, which she underwent on January 29, 2013 at Lenox Hill Radiology & Medical Imagine Associates P.C. (R. 288-90.) The pelvis and hip x-rays revealed fractures of the left pelvis. (R. 288.) The lumbar spine x-ray was normal. (R. 290.)

On February 1, 2013, Ramsook saw Dr. Olshanetskiy for a follow-up visit. (R. 285-87.) Ramsook complained of persistent pain in her lower back and right hip. (R. 286.) Upon examination, Ramsook had full range of motion of the lumbar spine with limited side bending on the right. (R. 287.) Dr. Olshanetskiy diagnosed left pelvic/pubic fractures, lumbosacral strain, low back pain and right hip contusion, and recommended that Ramsook follow up with an orthopedist. (*Id.*)

### C. Dr. Jonathan Gordon, M.D. – Orthopedist

On February 11, 2013 Ramsook saw orthopedist Dr. Jonathan Gordon, M.D., for a consult regarding her lower back pain and left hip injury. (R. 390-91.) Dr. Gordon noted pain and tenderness in the lumbar spine and a positive straight leg test on the left side.[9] (R. 390.) He

---

[7] Sacroilitis is inflammation (arthritis) in the sacroiliac joint, which is the joint between the sacrum and the ilium bones of the pelvis and the associated ligaments. *Dorland's* at 1403, 1662.

[8] Nabumetone is a NSAID used in the treatment of osteoarthritis and rheumatoid arthritis. *Dorland's* at 1229.

[9] Straight leg raising "is a means of diagnosing nerve root compression, which can be caused by a herniated disc. The patient lies flat while the physician raises the extended leg. If the patient feels pain in the back at certain angles (a 'positive test'), the pain may indicate herniation." *Moore v. Astrue*, No. 07-CV-05207 (NGG), 2009 WL 2581718, at *2 (E.D.N.Y. Aug. 21, 2009) (internal citation omitted).

assessed that the pain and tenderness were due to the pubic ramus fracture, but noted that the hip was stable. (*Id.*) Dr. Gordon prescribed Naprosyn[10] and physical therapy. (*Id.*) He further noted that he would "keep [Ramsook] out of work" and asked her to follow up in four weeks. (*Id.*) During the follow-up visit on February 26, 2013, Dr. Gordon found that Ramsook still had pain and tenderness, but that she was improving. (R. 386.) He noted that he would continue Ramsook in therapy and scheduled a follow-up appointment in two weeks. (*Id.*)

During a follow-up visit on March 26, 2013, Dr. Gordon noted that x-rays of Ramsook's pelvis fractures showed that they were "healing well." (R. 382.) On examination, Ramsook had full range of motion in the lumbar spine with some pain in the right hip. (*Id.*) Dr. Gordon assessed sprain and strain of specified sites of the hip and thigh, as well as sciatica.[11] (*Id.*) He noted that Ramsook was "going back to work light duty no lifting over 10 lbs." (*Id.*) Dr. Gordon saw Ramsook again on April 26, 2013. (R. 378-79.) The examination results were largely the same, though Dr. Gordon noted that Ramsook was in a lot of pain with tenderness. (R. 378.) Dr. Gordon ordered an MRI of the back and recommended that Ramsook follow up with pain management. (*Id.*)

### D.     Dr. Nilufer Guleyupoglu, M.D. – Pain Management Specialist

Between May 2013 and May 2014, Ramsook saw pain management specialist Dr. Nilufer Guleyupoglu, M.D., for low back pain. (R. 311-77.) On May 9, 2013, Ramsook described her pain as eight out of ten on a zero-to-ten scale and explained that the pain was constant with frequent flares that caused her to have a hard time sleeping. (R. 374.) Ramsook reported that the pain was

---

[10] Naprosyn is a trademark for a preparation of naproxen, a NSAID used in the treatment of pain, inflammation and osteoarthritis, among other things. *Dorland's* at 1232.

[11] Sciatica is a syndrome characterized by pain radiating from the lower back into the lower limbs. *Dorland's* at 1678.

aggravated by standing, prolonged walking and prolonged sitting. (*Id.*) She further reported that physical therapy that she had been doing for the past two months was helping, but that she was not able to go back due to insurance issues. (*Id.*) Dr. Guleyupoglu noted that Ramsook's physical exam findings were more indicative of facetogenic etiology (related to the facet joints), but that he could not rule out lumbar radiculopathy[12] and sacroiliac arthropathy (joint disease) as the cause of her pain. (R. 373.) Dr. Guleyupoglu prescribed Percocet and ordered an MRI of the lumbar spine. (R. 374.) The MRI, performed by Dr. Gordon Heller at Columbus Circle Imaging, showed an intervertebral disc bulge at L5/S1 with an associated left paracentral annular tear. (R. 371.) Dr. Heller's impression was minimal lumbar spondylosis with no evidence of spinal canal stenosis at any lumbar level.[13] (*Id.*)

On June 13, 2013, Ramsook reported that her pain was unchanged. (R. 366.) Dr. Guleyupoglu found limited range of motion in the lumbar spine due to tenderness and noted a slightly antalgic gait.[14] (*Id.*) He noted that the MRI indicated the presence of minimal lumbar spondylosis and L5/S1 disc bulge, and again wrote that physical exam findings were more indicative of facetogenic etiology and sacroiliac arthropathy as the driving force. (*Id.*) Dr. Guleyupoglu increased Ramsook's dose of Neurontin and discussed with Ramsook the possibility

---

[12] Radiculopathy is a "disease of the nerve roots." *Dorland's* at 1571. Lumbar radiculopathy is a "disease of the lumbar nerve roots, such as from a disc herniation or compression by a tumor or bony spur, with lower back pain and often paresthesias[,] an abnormal touch sensation. *Id.* at 1383, 1571.

[13] "Spinal stenosis is a 'narrowing of the vertebral canal, nerve root canals, or inter-vertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equine and include pain, paresthesias, and neurogenic claudication.'" *Moore*, 2009 WL 2581718, at *4 n.21 (quoting *Dorland's Illustrated Medical Dictionary* 1795 (31st ed. 2007)).

[14] "An antalgic gait is one in which the stance phase of walking is shortened on one side due to pain on weight bearing." *Rodriguez v. Astrue*, No. 02-CV-01488 (BSJ) (FM), 2009 WL 1619637, at * 6 n.23 (S.D.N.Y. May 15, 2009) (internal citation omitted).

of doing a diagnostic right lumbar median nerve branch block, which she indicated she wanted to pursue. (R. 367-68.)

During follow-up visits in July and August 2013, Ramsook indicated that her pain had increased. (R. 355-57, 361-63.) Dr. Guleyupoglu then started her on a Butrans Patch weekly.[15] (R. 356.) In September 2013, Ramsook reported that her pain was the same character and presentation, but that she felt worse and that the Percocet was making her feel high and groggy with little benefit. (R. 349.) Dr. Guleyupoglu noted that Ramsook appeared depressed and that 10 out of 18 fibromyalgia points were positive. (R. 350.) He stopped the Butrans Patch because Ramsook was experiencing itching and started Ramsook on Cymbalta in addition to continuing her other medications. (R. 351.) The physical examination was largely the same during a visit on November 7, 2013. (R. 343-46.) Dr. Guleyupoglu administered trigger point injections, which he repeated during a visit on December 5, 2013. (R. 339, 345.)

In January 2014, Dr. Guleyupoglu noted a positive iliac compression test. (R. 332.) He also noted 11 out of 18 fibromyalgia points were positive. (*Id.*) On January 15, 2014, Dr. Guleyupoglu administered median branch nerve blocks of the L3/L4, L4/L5, L5/S1 facet joints. (R. 329.) In February 2014, Ramsook reported that the pain was still present and Dr. Guleyupoglu's continued her medications and discussed repeating trigger point injections or nerve block if needed in the future. (R. 323-26.) By March 2014, Ramsook reported pain of ten out of ten to the point of crying. (R. 317.) Dr. Guleyupoglu stopped Percocet and started Ramsook on Lorzone. (R. 319.) Dr.

---

[15] A Butrans Patch "is indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." https://www.drugs.com/pro/butrans-patch.html.

Guleyupoglu also prescribed an aquatic therapy course with the goal of Ramsook maintaining a home exercise program. (*Id.*)

In May 2014, Ramsook still was reporting pain of ten out of ten. (R. 311.) Dr. Guleyupoglu noted that Ramsook had multifactorial pain etiologies stemming from facetogenic/sacroiliac arthropathy, as well as a psychological component, which compounded and perpetuated her pain perception. (R. 312.) He further noted that Ramsook had been unable to start aquatic therapy due to finances, but that he had reminded her of the ultimate goal of her maintaining a home exercise program to "get back some functionality increase." (R. 313.)

Throughout the treatment period, Dr. Guleyupoglu submitted worker's compensation forms regarding his treatment of Ramsook and his opinion about her percentage of temporary impairment and ability to return to work. (R. 315-16, 321-22, 327-28, 335-36, 341-42, 347-48, 353-54, 358-59, 364-65, 369-70, 375-77.) In May 2013, Dr. Guleyupoglu assessed that Ramsook had a temporary impairment of 100% and could not return to work due to pain. (R. 370.) His assessment remained the same until May 2014, when he assessed that Ramsook had a temporary impairment of 50%, but still could not return to work due to pain. (R. 316)

     **E.**     **Dr. Sireen Gupal , M.D. – Pain Management Specialist**

From June 2014 through April 2016, Ramsook saw pain  management specialist Dr. Sireen Gopal, M.D. During a visit on June 3, 2014, Ramsook reported constant pain with a severity of ten out of ten, but also reported that the pain improved with medications. (R. 454-55.) Dr. Gopal assessed lumbar radiculopathy, lumbosacral arthritis, sacroiliitis and unspecified muscle pain. (R. 456.) Dr. Gopal changed Ramsook's medications from Oxycodone and Gabapentin to Lyrica and Norco, and increased her dose of Cymbalta. (*Id.*) He also recommended epidural injections. (R.

457.) Ramsook received trigger point injections each month from July 2014 through October 2014 (R. 446, 449, 452, 454), and on and off again from January 2015 through April 2016. (R. 430, 432, 435, 438, 482, 491, 497, 501, 515, 519.)

In September 2014, Dr. Gopal noted that Ramsook was unable to lift greater than ten pounds, had restrictions in bending, pushing, and pulling; should avoid twisting and bending activities of the spine, and should limit prolonged sitting, standing or walking. (R. 449.)

In October 2014, Dr. Gopal assessed Ramsook with opioid type dependence/unspecified abuse and explained the risks of chronic habitual narcotic use. (R. 444-45.) Ramsook insisted that chronic narcotic treatment helped her function and quality of life, and maintained this position throughout her treatment with Dr. Gopal. (R. 429, 435, 438, 442, 490, 497, 503, 507, 517.)

In January 2015, Dr. Gopal conducted a physical therapy assessment for Ramsook. (R. 486-87.) Dr. Gopal noted that Ramsook was able to complete all exercises and was progressing slowly with exercise. (R. 487.)

On April 24, 2015, Dr. Gopal completed a Treating/Examining Source Statement of Physical Capability, opining that Ramsook could lift/carry less than ten pounds; stand for 20 minutes without interruption; sit for 30 minutes without interruption; could never climb, balance, stoop, crouch, kneel or crawl; and was unable to push/pull or climb ladders. (R. 425-26.)

In July 2015, Ramsook underwent an electromyography/nerve conduction study of her lower extremities. (R. 510-13.) Dr. Gopal found no evidence of lumbar radiculopathy, but noted that Ramsook's symptoms could be related to chemical and inflammatory radiculitis. (R. 511.)

In October 2015, Dr. Gopal completed another Treating/Examining Source Statement of Physical Capability. (R. 458-59.) His assessment was largely the same as in April, except he opined

that Ramsook could stand for 30 minutes with frequent breaks and sit for less than one hour with frequent breaks. (R. 458.) Further, he indicated heights and moving machinery as additional environmental restrictions. (R. 459.)

In January 2016, Ramsook underwent an MRI of the lumbar spine on referral from Dr. Gopal. (R. 520.) Dr. Robert Bernstein, M.D., of University Diagnostic Medical Imaging, P.C., found no disc herniations and no central or neural canal stenosis. (R. 520.) Several days later, Ramsook saw Dr. Gopal for physical therapy treatment. (R. 484-85.) Dr. Gopal noted that Ramsook's prognosis was good and recommended that she continue physical therapy. (R. 484.)

In March 2016, Ramsook received an epidural injection. (R. 514.) In May 2016, Dr. Gopal referred Ramsook for another MRI of the lumbar spine, this time performed by Dr. Nurayan Paruchuri, M.D. of Doshi Diagnostic. (R. 521-22.) Dr. Paruchuri found that there was a disc bulge with anterior thecal sac impingement at L1-2. (R. 521.) Dr. Paruchuri also performed an MRI of the pelvis and found that there was no evidence of any pelvic fracture, thus he concluded that any prior fracture was likely healed. (R. 523.)

**F.      Dr. Alok Sharan, M.D.**

In June 2015, while seeing Dr. Gopal for pain management, Ramsook saw Dr. Alok Sharan, M.D., for an orthopedic visit. (R. 466-67.) Dr. Sharan noted that Ramsook had a negative straight leg raise bilaterally and full strength in her lower extremities. (R. 467.) Dr. Sharan assessed lumbar radiculopathy and encouraged Ramsook to get further injections for pain management. (*Id.*)

**G.      Dr. Jay Nathan, M.D. –  Independent Medical Examiner**

Ramsook was examined by an independent medical examiner in the specialty of orthopedics, Dr. Jay Nathan, M.D., on three separate occasions in connection with her worker's

compensation claim. During the first evaluation, on April 23, 2013, Ramsook reported pain in her wrists and hips, headaches, difficulty sleeping and blurred vision. (R. 303.) On examination, Dr. Nathan found full range of motion in both hips and full bending and rotation in the thoracolumbar spine, but reduced flexion. (R. 304-05.) Dr. Nathan's impression noted "status post pelvic rami fracture" and lumbar sprain. (R. 305.) Dr. Nathan opined that Ramsook had a moderate degree of disability, but could return to light duty work with certain restrictions, including no lifting more than ten pounds, no prolonged walking or standing, no ladder work and minimal stairs. (*Id.*)

Dr. Nathan examined Ramsook for the second time on September 11, 2013. (R. 299-302.) Ramsook reported additional pain, as well as numbness and difficulty walking, bending and lifting. (R. 300.) Dr. Nathan's findings on examination were largely similar, though he noted a slight reduction in flexion of the thoracolumbar spine. (R. 301.) Dr. Nathan recommended cortisone injections to the sacroiliac joint and continued orthopedic care. (*Id.*) Dr. Nathan again concluded that Ramsook had a moderate degree of disability, but noted that she could return to light duty work in a mostly sedentary capacity with the restriction that she not lift more than ten pounds. (*Id.*)

Dr. Nathan examined Ramsook again on March 26, 2014. (R. 295-98.) Dr. Nathan's findings on examination were similar to his previous examinations, except he noted further reduction in flexion of the thoracolumbar spine and a right-sided limp. (R. 297.) His impression regarding Ramsook's spine changed from a sprain to right lumbar radiculopathy. (*Id.*) Dr. Nathan recommended a lumbar epidural injection, with possible follow-on injections for a total of three, and continued orthopedic care. (*Id.*) Dr. Nathan's assessment of Ramsook's disability remained

the same as in September 2013 and he reiterated that she could return to light duty work in a mostly sedentary capacity with the restriction that she not lift more than ten pounds. (*Id.*)

## IV. The May 3, 2016 Administrative Hearing

At the administrative hearing on May 3, 2016, Ramsook presented with a cane and testified that she used it when she felt like she was going to fall. (R. 36.) Ramsook testified that she lived in a multi-family house with three of her children and that one of her daughters helped her with her daily activities, including making breakfast, walking to the bathroom and showering. (R. 52-53.) Ramsook testified that she continued to get trigger point injections, despite little relief, because her doctors wanted her to. (R. 41.) Ramsook further testified that even though her pain continued she was afraid to have surgery. (R. 47, 63.)

Vocational expert ("VE") Esperanza DiStefano also testified at the hearing. (R. 64-75, 79-80.) The VE classified Ramsook's past work as a skilled position requiring medium exertion. (R. 65.) The VE testified that Ramsook had several transferable skills, including customer service skills, administrative and supervisory skills, clerical skills, expressive and receptive communication skills, and critical thinking skills. (R. 68-69.) The ALJ asked the VE to assume an individual of Ramsook's age, education and experience who could perform a reduced range of sedentary work limited to only occasionally climbing ramps and stairs, stooping, kneeling, crouching and crawling, and asked the VE what jobs were available for someone with Ramsook's transferable skills. (R. 68-69.) The VE testified that she believed such an individual could perform the jobs of customer complaint clerk, information clerk or reader. (R. 70-72.) The ALJ then asked whether an individual who required a sit/stand option, such that the individual could stand no more than 20 minutes and sit continuously no more than 30 minutes at a time, and who required

a cane to ambulate fifty percent or one hundred percent of the time, could still perform the jobs the VE identified. (R. 72-73, 79-80.) The VE testified that such an individual could perform the jobs identified. (R. 73.)

**V.  ALJ Feuer's Decision And Appeals Council Review**

Following the five-step process, *see infra* Discussion Section I(B), ALJ Feuer determined that Ramsook did not have a disability within the meaning of the Act. (R. 12-24.) The ALJ found at step one that Ramsook had not engaged in substantial gainful activity since the onset date. (R. 14.) At step two, the ALJ determined that Ramsook had the following severe impairments: fractured pelvis and disc bulge with thecal sac impingement. (*Id.*) The ALJ noted that the record contained a few references to "fibro points" suggesting fibromyalgia points, but did not include fibromyalgia as a sever impairment because there was no diagnosis in the record and Ramsook "d[id] not allege fibromyalgia as an impairment contributing to her inability to work." (R. 15.)

At step three, the ALJ found that Ramsook did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 15.) In making this decision, the ALJ considered Listing 1.04 for disorders of the spine, but found that the record did not indicate the requisite objective medical findings. (*Id.*)

The ALJ then assessed Ramsook's Residual Functional Capacity ("RFC") and determined that she was able to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, and that she required a sit/stand option that would permit her to sit a maximum of 30

minutes and stand 20 minutes continuously. (R. 15.) The ALJ further concluded that Ramsook required the use of a cane to ambulate 50% of the time. (*Id.*)

At step four of the sequential analysis, the ALJ found that Ramsook was not capable of performing her past work as a department manager because her past relevant work required a medium exertional level. (R. 21.)

Proceeding to step five, the ALJ first noted that Ramsook was 48-years-old on the alleged disability onset date, but was now "an individual closely approaching advanced age" as defined in 20 C.F.R. § 404.1563. (R. 21.) The ALJ also noted that Ramsook had at least a high school education and was able to communicate in English. (*Id.*) Next, the ALJ found that, in her prior work, Ramsook had acquired a number of transferable skills, including, among others, customer service skills and clerical skills. (R. 22.) The ALJ found that Ramsook could perform other jobs of customer complaint clerk, information clerk, reader and order clerk. (*Id.*) The ALJ relied on the vocational expert's experience and education, particularly with respect to the applicability of the sit-stand option. (*Id.*) Applying the Medical-Vocational Guidelines, 20 C.F.R. § 404, Subpart P, Appendix 2, the ALJ found that Ramsook was not disabled. (*Id.*)

Following the ALJ's decision, Ramsook sought review from the Appeals Council, which denied her request on December 11, 2017. (R. 1-4.)

## DISCUSSION

### I.  Legal Standards

#### A.  Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v.*

*Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-4518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is 'a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless 'a reasonable factfinder *would have to conclude otherwise*.'" *Banyai v. Berryhill*, No. 17-1366-CV, 2019 WL 1782629, at *1 (2d Cir. Apr. 24, 2019) (summary order) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks omitted)). If the findings of the Commissioner as to any fact are

supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

### B. Determination Of Disability

Under the Act, every individual determined to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509 [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520.

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any Listing), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that

the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51.

### C. **The Treating Physician Rule**

Under the treating physician rule, the ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).

"Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ should consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion." *Gonzalez v. Comm'r of Soc. Sec.*, No. 16-CV-08445 (KMK) (PED), 2017 WL 7310391, at *11–12 (S.D.N.Y. Dec. 21, 2017), *report and recommendation adopted*, 2018 WL 671261 (S.D.N.Y. Jan. 31, 2018) (internal citations omitted).

While the ALJ need not expressly address each factor, the ALJ must provide "good reasons" for the weight accorded to the treating physician's opinion. *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order); *see also* 20 C.F.R. §§ 404.1527(c) (stating that the agency "will always give good reasons in our notice of determination or decision for the

weight we give [the claimant's] treating source's opinion"); *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them.").

Despite the general rule, "[t]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, [including] the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). This is because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Burgess*, 537 F.3d at 128.

## II.    The ALJ's Decision Is Supported By Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to adequately weigh the medical opinion evidence. (Pl. Mem. at 14-20.) Plaintiff argues that the ALJ failed to provide good reasons for discrediting portions of Dr. Gopal's opinion and failed to adequately develop the record with respect to the perceived inconsistencies in Dr. Gopal's reports. (*Id.*) Plaintiff further argues that there is not substantial evidence in the record that Ramsook can sit for a total of six hours in an eight-hour work day, as required to perform sedentary work. (Reply Mem. at 2-3.) The Commissioner contends that the ALJ provided good reasons for rejecting portions of Dr. Gopal's opinion and did not have a duty to develop the record further, and that the ALJ's determination that Ramsook could perform sedentary work with some limitations is supported by substantial evidence. (Comm'r Mem. at 15-21.) For the reasons set forth below, the Court finds that the ALJ did not commit legal error and that his RFC determination is supported by substantial evidence.

First, the ALJ provided good reasons for according only partial weight to the opinion of Dr. Gopal. The ALJ explained that he did not give Dr. Gopal's opinion controlling weight because it was not entirely consistent with other substantial evidence in the record, including Dr. Gopal's own findings. (R. 19-20.) The ALJ further reasoned that the objective diagnostic testing revealed only mild abnormalities in the lumbar spine with no evidence of lumbar radiculopathy. (R. 20.)

Notably, the only parts of Dr. Gopal's opinion that the ALJ did not credit were Dr. Gopal's determination that Ramsook could lift less than ten pounds (as opposed to up to ten pounds) and his determination that Ramsook could not perform any postural activities (as opposed to occasionally performing those activities).[16] As for Ramsook's ability to lift, in September 2014, Dr. Gopal noted that Ramsook was unable to lift greater than ten pounds. (R. 449.) In April 2015, Dr. Gopal opined that Ramsook could lift less than ten pounds, but on the same form noted that she could not move greater than ten pounds. (R. 425-26.) In October 2015, Dr. Gopal opined that Ramsook could lift/carry less than ten pounds, but based his opinion on the same medical evidence (a May 2013 MRI) that would have been available to him in September 2014 when he found that Ramsook could lift ten pounds. (R. 458.) Because Dr. Gopal's opinion as to whether Ramsook could lift ten pounds was inconsistent, the ALJ was entitled to resolve the inconsistency. *See Grygielko-Sanchez v. Comm'r of Soc. Sec.*, No. 16-CV-05357 (NG), 2018 WL 6335412, at *7

---

[16] While Dr. Gopal also opined that Ramsook could never push or pull, that opinion is not inconsistent with the ALJ's RFC determination, as pushing and pulling are not requirements of sedentary work. *See Davis v. Astrue*, No. 09-CV-04006 (KBF), 2013 WL 3388951, at *17 (S.D.N.Y. July 8, 2013) (ample support for sedentary RFC finding even though ALJ did not assess plaintiff's ability to push or pull because pushing and pulling not requirements of sedentary work) (citing 20 C.F.R. § 404.1567(b) (discussing pushing and pulling as requirements of light work)); *see also Vesneske-Margage v. Berryhill*, No. 16-CV-00500 (MAT), 2017 WL 4112021, at *5 (W.D.N.Y. Sept. 18, 2017) (treating physician's opinion that plaintiff must avoid prolonged pushing or pulling did not implicate ALJ's sedentary RFC finding).

(E.D.N.Y. Dec. 4, 2018) (ALJ entitled to resolve inconsistency between physician's reports as to whether claimant could lift and carry at least ten pounds).

As for postural limitations, the ALJ concluded that Ramsook could engage in these movements "occasionally," which the SSA defines as "from very little to up to one-third of the time." *Vargas v. Berryhill*, No. 17-CV-01623 (PAE) (HBP), 2018 WL 5619962, at *29 (S.D.N.Y. Aug. 10, 2018), *report and recommendation adopted*, 2018 WL 5619952 (S.D.N.Y. Aug. 29, 2018) (citing SSR 83-10, 1983 WL 31251 at *5 (Jan. 1, 1983)). In reaching this conclusion, the ALJ contrasted Dr. Gopal's opinion that Ramsook never could perform postural activities with Dr. Gopal's findings on physical examination (which were consistent with the findings of Dr. Nathan and Dr. Guleyupoglu), that Ramsook had normal gait, negative straight leg raising, no overt evidence of instability, normal motor strength and normal reflexes. (*Id.*) In discussing Dr. Gopal's findings, the ALJ also noted that, as of February 2016, Dr. Gopal had found only mild restrictions in Ramsook's flexibility. (R. 18.) The Court finds that the ALJ did not err in assigning partial weight to Dr. Gopal's opinion in light of this conflicting evidence. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling."); *see also Revi v. Comm'r of Soc. Sec.*, No. 16-CV-08521 (ER) (DF), 2018 WL 1136997, at *29-30 (S.D.N.Y. Jan. 30, 2018), *report and recommendation adopted*, 2018 WL 1135400 (S.D.N.Y. Feb. 28, 2018) (ALJ properly discounted opinion of treating physician when medical records showed mild to moderate symptoms,

negative test results and normal muscle strength and imaging results showed only mild findings).[17]

Similarly, the Court finds that the ALJ did not err in failing to further develop the record as the ALJ possessed a complete medical history. *See Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."); *see also Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012) (summary order) ("The mere fact that the evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician.") (internal quotation omitted).

Plaintiff also contends that the ALJ's RFC determination is not supported by substantial evidence because the evidence does not support a finding that Ramsook could sit for a total of six hours in an eight-hour workday, as required to perform sedentary work. (Pl. Mem. at 19-20; Reply Mem. at 2-4.) Plaintiff notes that Dr. Gopal's opinion as to her ability to sit referred to what Ramsook could do "without interruption" and did not address how many cumulative hours she could sit. (Reply Mem. at 3.) Plaintiff further contends that Dr. Nathan's opinion that she could perform sedentary work does not constitute substantial evidence in support of the ALJ's

---

[17] Nor was it error for the ALJ to assign limited weight to Dr. Guleyupoglu's opinion that Ramsook was temporarily disabled and could not return to work. As the ALJ noted, these opinions did not address work-related restrictions and related to Ramsook's "temporary impairment." *Accord DiPalma v. Colvin*, 951 F. Supp. 2d 555, 574 (S.D.N.Y. 2013) (ALJ not required to give controlling weight to finding of disability made in context of Worker's Compensation, where disability is defined as the inability to return to past relevant work). In any event, the ALJ determined that Ramsook could not return to her previous employment as a department manager and, thus, the ALJ's decision was consistent with Dr. Guleyupoglu's opinion.

determination because his opinion was rendered as part of a Worker's Compensation examination. (*Id.*)

The Court finds no basis to disturb the ALJ's finding. While the standards as to the ultimate determination of disability are different in the Worker's Compensation context, and thus an ALJ is not required to give such conclusions controlling weight, the ALJ was permitted to consider Dr. Nathan's opinion regarding Ramsook's ability to perform sedentary work, which is not a conclusion as to disability itself and is supported by other evidence in the record. Further, the ALJ's determination that Ramsook could sit up to six hours with a sit-stand option is not contradicted by any treating source opinion or other objective evidence in the record. Thus, the Court finds that there is substantial evidence to support the ALJ's determination that Ramsook can perform sedentary work with certain restrictions. *See, e.g., Josielewski v. Berryhill*, No. 15-CV-00728 (MAT), 2018 WL 903471, at *5 (W.D.N.Y. Feb. 15, 2018) (substantial evidence supported finding that claimant could perform sedentary work when, *inter alia*, consultative opinions not inconsistent with finding that claimant could sit for a total of six hours).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is DENIED, and the Commissioner's motion is GRANTED.

DATED:     May 15, 2019
          New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**